**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-422-APM** |
| **v.** | : | |
| | : | |
| **SEAN DAVID WATSON,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Sean David Watson to a 14-day term of imprisonment, as a condition of his probation, 36 months' probation, 60 hours of community service, and $500 restitution.

**Introduction**

Defendant Sean David Watson, a 51-year-old self-employed army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on 04/21/22, (ECF No. 34 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Watson pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days custody as part of a 36-month term of probation, is appropriate in this case because  (1) Watson was arrested on January 5th for crossing a police line in order to confront BLM protesters; (2) as he approached the Capitol on January 6, Watson saw rioters shoving and overtaking police officers on the West Front of the Capitol (3) Watson entered the Capitol after seeing others break into the building; (5) Watson remained in the building for 35 minutes; (4) Watson bragged that January 6th was the "[p]roudest day of my life!" (5) Watson initially lied to the FBI claiming he did not enter the Capitol; (6) Watson falsely claimed that Capitol Police attacked rioters implying they were cause of the attack on the Capitol; and (7) Watson admitted to destroying evidence when he deleted the videos he recorded while inside the Capitol; and (8) as an Army veteran, Watson was aware of the dangers that his and other rioters' presence posed to police and members of Congress on January 6th.

The Court must also consider that Watson's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the

numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Watson's crime support a sentence of 14 days custody as part of a 36-month term of probation, 60 hours community service, and $500 restitution in this case.

## I.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Watson's conduct and behavior on January 6.

### *Sean David Watson's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Sean David Watson traveled from Alpine, Texas to Washington, D.C., to participate in multiple political rallies. See ECF 34 ¶ 8. Watson told Alpine police that while he was in D.C., he fought with the Antifa and Black Lives Matter (BLM) people.  On January 5, 2021, Watson was arrested by Metropolitan Police officers for illegally crossing a police line during a BLM rally, but that citation was not pursued or "papered." *See* PSR ¶ 26.

On January 6, Watson attended the Trump rally in Washington, D.C. He then marched to the Capitol with a large number of other people from the rally.  ECF 34 ¶ 9. While marching to the Capitol, Watson recorded the surrounding events on his mobile telephone.  Among the photos he took is one outside the West Front of the Capitol.   *See* Image 1.  That photograph shows Metropolitan Police officers forming a defensive line restricting access to the Capitol while another officer (circled in red) appears to be positioning a speaker used to broadcast a dispersal

order to the crowd. *Id.*



*Image 1*

This photo was taken sometime around 2:00 p.m. which was when a crowd (from Trump's rally that ended at approximately 1:15pm) was forming in the restricted area around the West Front of the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to Capitol Police officers' calls for help to limit the crowd's access to the Capitol, began broadcasting a dispersal order to the crowd. This dispersal order began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles. By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With officers' defensive lines

extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

The first breach into the U.S. Capitol was at the Senate Wing doors at 2:13 p.m.  Watson entered through those same doors 34 minutes later, at 2:47 p.m.  Based upon images he recorded, Watson was outside the Senate Wing doors for some time before entering.  Watson recorded others gathering at the Senate Wing doors before the windows were broken open.  *See* Image 2.



*Image 2: Outside Senate Wing doors*

Watson also recorded persons breaking into the door to the southwest (the left) of the Senate Wing doors.  See Images 3 and 4.



*Image 3: Door to the southwest of the Senate Wing doors*



*Image 4:  Door to the southwest of the Senate Wing doors*

Watson entered the Capitol at approximately 2:47 p.m. through the Senate Wing doors. *See* Image 5.  Meanwhile, others in the crowd continued to enter the Capitol through nearby shattered windows.



*Image 5*

From the Senate Wing door entrance, Watson turned to the right and walked with a large crowd toward the Crypt. *See* Image 6.



*Image 6*

While inside the Crypt, Watson wandered around the area, posed for a picture, and paraded with a flag.  *See* Images 7, 8, and 9.



*Image 7*



*Image 8*



*Image 9*

At approximately 3:22 p.m., Watson exited the Capitol through the Senate Wing doors.

*See* Image 10.



*Image 10*

In total, Watson spent 35 minutes inside of the Capitol. Watson has admitted that he knew at the time he entered the Capitol that he did not have permission to do so, and while inside the Capitol, willingly and knowingly paraded, demonstrated or picketed.  ECF 34 ¶ 11.

*Watson's Post January 6th Statements*

After the attack on the Capitol, Watson sent texts, photographs and videos to others bragging about his participation in siege at the Capitol. For example, on January 7, 2021, Watson texted, "I am fine. I was one of the people that helped storm the capitol building and smash out the windows. We made history today. Proudest day of my life!"  Later that day, Watson texted, "Got some videos and pics will share them when I get back."  In addition to texts, law enforcement officials were able to download images regarding Watson's course on January 6 from Watson's telephone  despite Watson's admitted attempt to delete them.

In  addition to messages sent to friends, Watson gave a statement to a local media reporter. On  February 5, 2021, Watson was interviewed by a reporter with CBS7, a news affiliate in West Texas.  https://www.cbs7.com/2021/02/06/first-on-cbs7-fbi-raids-home-of-alpine-man-who-took-part-in-capitol-riot/  In this interview, Watson admitted he was among the persons who stormed the Capitol.  He stated that the Capitol Police attacked the rioters, implying the officers' use of tear gas and other tactics induced the crowd to invade the Capitol.  Watson ended the interview bragging he does not have regrets and claimed, "I am actually proud of what I'm doing."  *Id.*

*Defendant's Interview*

On January 19, 2021, Watson was interviewed by the FBI and Alpine Police officers. During the interview, Watson admitted to traveling to Washington, D.C. between January 4 and January 7, 2021. Watson claimed to have participated in multiple political rallies but denied being at the U.S. Capitol building at any point during his trip to Washington, D.C. In an earlier encounter

10

with Alpine Police officers, on January 10, 2021, Watson stated, "he was fighting with the BLM and Antifa people in the streets of DC" and "I was one of the people that stormed the capitol."

On February 4, 2021, Watson agreed to a post-arrest interview and admitted that he was not forthcoming at his initial FBI interview.  During this second interview, Watson admitted to entering the U.S. Capitol and to recording footage on his cell phone. Watson claimed he had since deleted the footage.

*The Charges and Plea Agreement*

On April 22, 2021, the United States charged Watson by criminal complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). On April 28, 2021, law enforcement officers arrested him at his home in Alpine, Texas. On June 22, 2021, the United States charged Watson by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 21, 2022, pursuant to a plea agreement, Watson pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Watson agreed to pay $500 in restitution to the Department of the Treasury.

## II.     Statutory Penalties

Watson now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Watson faces up to six months of imprisonment and a fine of up to $5,000. Watson must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days custody as part of a 36-month term of probation, 60 hours community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Watson's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1)

whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Watson personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Watson is therefore not a mitigating factor in misdemeanor cases.

Watson, an Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than a million dollars' worth of property damage.  Watson was aware of the Capitol Police defense line on the West Front.  He was aware officers used tear gas and other tactics to limit access to the Capitol.  Watson recorded others attacking the Capitol near the Senate Wing doors, the location of the initial breach into the building.  Knowing the jeopardy posed to police and the lawful occupants of the Capitol building by a violent entry into the building, and with plenty of time to reconsider his actions, Watson entered the U.S. Capitol.  While inside the Capitol, Watson paraded with a flag, remaining inside the building for 35 minutes.

Watson's statements after January 6 show a total lack of remorse.  To the contrary, Watson bragged that January 6th was the proudest day of his life.  During an interview by a local reporter after the search of his home by FBI on February 5, 2021, Watson doubled down and stated he had "no regrets" and was "actually proud" of his involvement in the Capitol riot.  Prior to this statement, Watson destroyed evidence when he deleted images from this mobile telephone before FBI seized the device.  Watson also touted false information to a news reporter when he claimed "the Capitol Police attacked us" implying the officers somehow instigated the riot by using tear gas and other crowd dispersal tactics without justification.  The broadcasting of this false statement, Watson's decision to participate in the attack at the US Capitol, and subsequent pride for doing so, is shocking in light of Watson's military service and training.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14-days custody as part of a 36-month term of probation in this matter.

**B.      The History and Characteristics of Watson**

Watson is a trained medical specialist and Army veteran.  ECF 36 ¶¶ 43 & 48.  Watson was employed by Big Bend Regional Medical Center until February 2021 and is now self-employed.  *Id.*  ¶¶ 44-46. Watson has no criminal history convictions.  *Id.* ¶¶ 20-25.

The sole incident prior to January 6, 2021 occurred on January 5, 2021 when Watson was arrested and cited for Crossing a Police Line by the Metropolitan Police Department.  *Id.* ¶ 26. Watson told Alpine police officers that he fought with associates of BLM and Antifa while in D.C. and told an Alpine news reporter he was arrested during a BLM protest on January 5th.  Watson has not been charged with any other conduct related to this January 5th citation and prosecution of the citation has not proceeded. *Id.*

Watson has been compliant with conditions of release pending this case.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again." (Statement of Judge Walton at sentencing, *United States v. Mariposa Castro,* 1:21-cr-00299, Tr. 2/23/2022 at 41-42.)

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

16

The government acknowledges that Watson accepted responsibility by entering into a written plea agreement. On the other hand, Watson's participation in the violent attack of the U.S. Capitol, his boasting about being proud of his involvement, and his false information implying Capitol Police instigated the siege, all in light of the fact that Watson is a decorated army veteran who swore an oath to protect the United States, clearly demonstrate the need for specific deterrence for this defendant.

E.    **The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Watson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot. Although those like Watson convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[4] *See United States v. Anna*

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Watson has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence imposed on Leonard Pearson Ridge IV (21-cr-406-JEB) for reference.  In that case, Ridge, like Watson, attended the Trump Rally, followed the crowd to the Capitol, witnessed others assaulting officers on the West Front Plaza, and entered the Capitol.  Ridge was inside the Capitol for 36 minutes; Watson was inside the Capitol for 35 minutes.  Like Watson, Ridge also boasted about his actions.  Both Watson and Ridge pleaded guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G).  Although the government sought 45 days custody with supervised release for Ridge, Judge Boasberg sentenced him  14 days consecutive incarceration, 12 months supervised release, $1000 fine, 100 hours community service and $500 restitution.

The Court may also consider the sentencing of Stephanie Miller (21-cr-266-TSC). Like Watson, Miller boasted about her participation in the Capitol Riot., claiming she ""enjoyed every part of what I did."  Unlike Watson, Miller entered the Capitol through a shattered window next to the Senate Wing doors. Miller entered with her husband who broadcast their actions in the Capitol via Facebook live.  Miller, who was in the Capitol for approximately 10 minutes (while Watson was in the building for 35 minutes), pleaded guilty to of 40 U.S.C. § 5104(e)(2)(G).  Judge Chutkan, sentenced Stephanie Miller to 14 days incarceration, 60 hours community service and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a 14-day term of imprisonment, as a condition of his probation, 36 months' probation, 60 hours of community

service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Graciela R. Lindberg*
Assistant United States Attorney
TX Bar No. 00797963
11204 McPherson Road, Suite 100A
Laredo, Texas 28045
Office: 956-721-4960
graciela.lindberg@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 16 day of August, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Graciela R. Lindberg*
Assistant United States Attorney
TX Bar No. 00797963
11204 McPherson Road, Suite 100A
Laredo, Texas 28045
Office: 956-721-4960
graciela.lindberg@usdoj.gov